**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | |
|---|---|
| **ANTONIO D. NAYLOR** | **CIVIL ACTION** |
| **VERSUS** | **NO: 10-713** |
| **ATLANTIC SOUNDING CO., INC.,**<br>**ET AL.** | **SECTION: "S" (1)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On September 28, 2009, plaintiff, Antonio Naylor, a seaman employed by defendant,

Atlantic Sounding Co., Inc. ("Atlantic Sounding"), injured his back while working as a deckhand

aboard the DREDGE G. D. MORGAN, a vessel owned and operated by defendant, Weeks Marine,

Inc. ("Weeks").  Plaintiff filed suit against Atlantic Sounding, Weeks, and Caillou Island Towing

Company, Inc. ("Caillou Island"), the operator of the M/V CHARLES CENAC, another vessel

involved in the incident, alleging claims under the Jones Act, 46 U.S.C. § 30101, unseaworthiness,

general maritime tort law, and maintenance and cure.  Defendants settled with plaintiff.  A bench

trial was held on October 20, 2011, regarding the apportionment of fault between Atlantic Sounding

and Caillou Island.[1]

---

[1]  Atlantic Sounding is a wholly owned subsidiary of Weeks. Plaintiff alleged a claim for the
unseaworthiness of the DREDGE G. D. MORGAN against Weeks.  However, no evidence was presented at
trial regarding the vessel's unseaworthiness.  Therefore, any claims against Weeks are DISMISSED, and fault
will be apportioned between Atlantic Sounding and Caillou Island.

**A.      Plaintiff's Accident**

At the time of the accident, the DREDGE G. D. MORGAN was dredging the Pascagoula

Ship Channel near Horn Island, Mississippi.   The operation required a floating discharge line,

referred to as the "pontoon line," to carry the dredged material from the vessel to the banks.  The

pontoon line consisted of a pipeline that floated on top of evenly spaced pontoon tanks that were

approximately ten feet long, four feet wide, and three feet high above the water line.  The pontoon

line had to be disconnected periodically to allow ship traffic to pass, and then reconnected to

continue the dredging.  Reconnecting the pontoon line required deckhands to position themselves

on the two pontoon tanks that were separated while tugs pushed the pontoon tanks together.

After midnight on September 28, 2009, plaintiff was on top of one of the pontoon tanks

aiding in the reconnection process.  He testified that it was a clear, windy night and the seas were

choppy, which caused the pontoon tank to rock with the waves. All of the witnesses to the accident

described the sea condition as choppy in their witness reports, and Glenn E. Harshaw, Jr., the M/V

CHARLES CENAC's captain described the seas being rough with two-and-a-half to three foot

ground swell.  Plaintiff and James Bullock, the DREDGE G. D. MORGAN's captain,  testified that

it was not unusual to perform the reconnection at night, and that they used the vessels' lights which

were bright.

Plaintiff testified that he had been involved in the reconnection process on several occasions

before the accident.  He testified that he did not think it was unsafe to do the reconnection due to the

weather.  He testified that he had "stop work" authority if he thought that the activity was too

dangerous, but that he did not exercise it.

At the time of the accident, plaintiff was standing on the pontoon tank, which he testified is the part of the normal operation. Bullock also testified that standing on the pontoon tank is an acceptable practice to perform this work. However, Weeks' marine dredging safety manager, Billy Nix, testified that sitting on the discharge line is preferable to standing on the pontoon tank, and the dredge mate should have discussed this positioning with plaintiff.

The M/V CHARLES CENAC was assisting in the reconnection process by pushing the pontoon tank upon which plaintiff stood. According to plaintiff, the reconnection normally takes approximately five to ten minutes, but on the night of the accident, they struggled for about thirty-five minutes before the accident to make the reconnection because of the wind and rough seas. Plaintiff testified that his accident occurred when the M/V CHARLES CENAC rammed the discharge line and then rammed in between the discharge line and the pontoon tank while it was trying to maneuver to the other side of the pontoon tank to get downwind to make the reconnection easier. Plaintiff testified that the assisting tug is not supposed to ram the discharge line or the pontoon tank and that this had not occurred when he performed the reconnection on previous occasions. Harshaw stated that the M/V CHARLES CENAC rammed the pontoon line because a swell came up under the vessel.

Plaintiff testified that working with the pontoon line was on-the-job training. He testified that the connection/reconnection process was discussed in safety meetings. Plaintiff had over forty-seven hours of training during his employment on Weeks' vessel.

3

**B.      Comparative Fault**

In maritime tort cases where more than one party is responsible for the damage, liability is apportioned on the basis of comparative negligence.  United States v. Reliable Transfer Co., 95 S.Ct. 1708, 1715-16 (1975); Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1130 (5th Cir. 1981).

**C.      The Jones Act**

Under the Jones Act, 46 U.S.C. § 30101 et seq., a seaman's employer is liable for damages if the employer's negligence, including negligence of the employer's officers, agents, or employees, caused the seaman's injury.  See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997) (*en banc*); see also Hopson v. Texaco, Inc., 86 S.Ct. 765, 766 (1966).  The employer is held to a standard of ordinary prudence under the circumstances. Id.  "A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury." Id.  The terms "slightest" and "featherweight" have been used to describe the reduced standard of causation between the employer's negligence and the employee's injury. Id. at 335; Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352 (5th Cir. 1988). "[T]he mere fact that an injury has occurred does not trigger liability under the Jones Act." Id. at 338.  Rather, there must be evidence that the shipowner, his employees, or agents were negligent. Id. Under the Jones Act:

> Negligence is the failure to use ordinary care under the circumstances; the doing of some act that a reasonably prudent person would not do; or the failure to do something that a reasonably prudent person would do under the same or similar circumstances. This negligence standard also is hand-in-glove with the employer's basic duty under the Jones Act - to exercise reasonable care to provide the seamen with a safe place to work.

Id.

The court finds that Atlantic Sounding failed to use ordinary prudence under the circumstances when it attempted the reconnection process in adverse weather conditions. All of the witnesses to the accident described the seas as choppy. Also, plaintiff testified that the reconnection normally takes five to ten minutes, but that they struggled for thirty-five minutes before his accident to make the reconnection due to the wind and rough seas. Further, the weather conditions necessitated the repositioning of the M/V CHARLES CENAC during which it rammed the pontoon line, which caused the accident. Therefore, this court finds that Atlantic Sounding is 40% at fault in causing plaintiff's injuries.

**D.     General Maritime Negligence**

Plaintiff's claims against Caillou Island arise under general maritime tort law. "The analysis of a maritime tort is guided by general principles of negligence law." In re Signal Intern., LLC, 579 F.3d 478, 491 (5th Cir. 2009) (internal quotation and citation omitted). "Under general tort principles, a tortfeasor is accountable only to those to whom a duty is owed." Id. "Duty is measured by the scope of the risk that negligent conduct foreseeably entails." Id. (internal quotation and citation omitted). "The risk [of foreseeability] is whether the harm that does occur is within the scope of danger created by the defendant's negligent conduct." Id. (internal quotation and citation omitted). In order for liability to be established, there must be a duty owed, a breach of the duty, an injury, and a causal connection between the defendant's conduct and the plaintiff's injury. Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000).

Caillou Island owed plaintiff a duty to navigate the M/V CHARLES CENAC safely when performing the reconnection. Unsafe navigation of the vessel foreseeably could cause an injury to

the deckhand on the pontoon tank.  Caillou Island breached that duty by ramming into the pontoon line twice, which caused plaintiff's injury.  Therefore, this court finds that Caillou Island is 60% at fault in causing plaintiff's injuries.

## CONCLUSION

On the basis of the above Findings of Fact and Conclusions of Law, the court finds that Caillou Island was 60% at fault in causing plaintiff's injuries, and Atlantic Sounding was 40% at fault in causing plaintiff's injuries.

New Orleans, Louisiana, this   4th   day of November, 2011.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**